**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **GEORGE SOULIOTES,** | 1:15-cv-00556 LJO SKO |
| **Plaintiff,** | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS (Doc. 47)** |
| **v.** | |
| **CITY OF MODESTO,** *et al.*, | |
| **Defendants.** | |

## I. <u>PRELIMINARY STATEMENT TO PARTIES AND COUNSEL</u>

Judges in the Eastern District of California carry the heaviest caseloads in the nation, and this Court is unable to devote inordinate time and resources to individual cases and matters. Given the shortage of district judges and staff, this Court addresses only the arguments, evidence, and matters necessary to reach the decision in this order. The parties and counsel are encouraged to contact the offices of United States Senators Feinstein and Boxer to address this Court's inability to accommodate the parties and this action. The parties are required to reconsider consent to conduct all further proceedings before a Magistrate Judge, whose schedules are far more realistic and accommodating to parties than that of U.S. Chief District Judge Lawrence J. O'Neill, who must prioritize criminal and older civil cases.

Civil trials set before Chief Judge O'Neill trail until he becomes available and are subject to suspension mid-trial to accommodate criminal matters. Civil trials are no longer reset to a later date if Chief Judge O'Neill is unavailable on the original date set for trial. Moreover, this Court's Fresno Division randomly and without advance notice reassigns civil actions to U.S. District Judges throughout

1    the nation to serve as visiting judges. In the absence of Magistrate Judge consent, this action is subject to

2    reassignment to a U.S. District Judge from outside the Eastern District of California.

3    ## II. PROCEDURAL POSTURE

4         Plaintiff George Souliotes was incarcerated in state prison for approximately sixteen years due to

5    his alleged involvement with a fire that occurred at a residential property he owned and rented in

6    Modesto, California. First Am. Compl. for Damages. ("FAC"), Doc. 42, ¶¶ 18, 44. Three people died in

7    the fire. *Id.* ¶ 18. On April 12, 2013 his judgment and sentence were vacated pursuant to 28 U.S.C. §

8    2254 on the basis that his defense counsel was ineffective at his trial.  *Id.* ¶¶ 42-42; Finding and

9    Recommendation Regarding Pet. For Writ of Habeas Corpus ("F & R's"), Req. for Judicial Notice

10   ("RJN"), Ex. E, Doc. 47-10, at 90-93; Order Adopting Finding and Recommendation with Edits Listed

11   Below, RJN, Ex. F, Doc. 47-11.[1] On July 2, 2013, Plaintiff entered a *nolo contendre* plea to three counts

12   of involuntary manslaughter on the basis that he failed to ensure that the property had an operable smoke

13   alarm. FAC ¶ 43. In exchange, the State dismissed pending arson and murder charges and agreed to

14   Plaintiff's immediate release. *Id.*

15        On April 10, 2015 Plaintiff, acting *pro se*, initiated this civil rights suit against the City of

16   Modesto, the Modesto Police Department ("MPD"), the Modesto Fire Department ("MFD",) and MPD

17   (?) officers Mike Harden, Roger Lee, Dick Ridenour, John Buehler, Dodge Hendee, Joe Pimentel, Bob

18   Evers and Tom Reuscher. Compl. Doc. 1. Defendants filed a motion to dismiss on November 13, 2015

19   (Doc. 34). [2]

20        On December 1, 2015, the parties stipulated to allow Plaintiff to file an amended complaint in

21   lieu of a response to the motion to dismiss and to extend filing deadlines. Docs. 38 & 41.  Plaintiff filed

22   _____

23   [1] A federal court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those
24   proceedings have a direct relation to matters at issue." *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc*., 971
     F.2d 244, 248 (9th Cir. 1992).

25   [2] This motion was terminated by the Court because it was mooted by the filing of the FAC.

his FAC on December 14, 2015, in which he alleges that the individual defendants conspired to deprive him of his right to a fair trial and engaged in a malicious prosecution "undertaken pursuant to the policy and practice of the Modesto Police Department and the Modesto Fire Department." FAC ¶¶ 58, 65, 79. Plaintiff further alleges that Defendants Mike Harden and Reuscher are liable as supervisors and that the MPD and MFD are liable for "failing to adequately train, supervise, and control its officers, such that their failure to do so manifests deliberate indifference." *Id.* ¶ 89.

After receiving an extension of time, Doc. 44, Defendants filed their motion to dismiss on February 26, 2016. Defs.' Notice of Mot. and Mot. to Dismiss ("MTD"), Doc. 47. Defendants argue that Plaintiff's claims fail pursuant to Rule 12(b)(6). *Id.* at 1. Plaintiff received two extensions of time, and filed his response on April 22, 2016. Pl.'s Resp. in Opp'n to Defs.' Mot. to Dismiss Pl.'s Am. Compl. ("Opposition"), Doc. 52. Defendants  replied on May 9, 2016.  Defs.' Reply in Supp. of Mot. to Dismiss ("Reply"), Doc. 57. The Court vacated the hearing set for the matter pursuant to Local Rule 230(g). Doc. 58.

### III. <u>FACTUAL BACKGROUND</u>[3]

In the early morning hours of January 15, 1997, a fire broke out at 1319 Ronald Ave, a residential property located in Modesto, California. FAC ¶ 18. Plaintiff owned and rented the property. *Id.* Three tenants, an adult woman and her two young children, died in the fire. *Id.* Plaintiff maintains that he was home asleep at the time the fire broke out. *Id.* ¶ 19.

MFD Investigator Tom Reuscher and MPD Officer Joe Pimentel were two of the first responders to arrive at the scene. *Id.*  ¶¶ 21, 23. Monica Sandoval (a witness) identified herself to Pimentel as a neighbor and told him that she had observed a recreational vehicle drive down the street several times before the fire began. *Id.* at ¶ 23. Ms. Sandoval reported that, at some point shortly before the fire began, the vehicle was parked across the street from 1319 Ronald Avenue, after which a driver emerged,

---

[3] Background facts are drawn from the FAC, the truth of which the court must accept for purposes of a Rule 12(b)(6) motion to dismiss.

carrying what appeared to be a pillowcase. *Id.* She observed the driver cross the street, enter the property, and return minutes later empty-handed. *Id.* Ms. Sandoval described the driver as being in his thirties or early forties, and as wearing glasses, blue denim jeans, a checkered shirt, and dark shoes. *Id.* Ms. Sandoval also stated that she did not get a "clear look" at the driver and would not be able to identify him. *Id.*

Defendants Lee, Ridenour, Pimentel and Reuscher met with Ms. Sandoval to conduct follow-up interviews. *Id.* ¶ 25. Plaintiff alleges that at least one of these interviews was audio-recorded. *Id.* He also alleges that Ms. Sandoval made a sketch of the vehicle. *Id.* Plaintiff clams that neither the audio recordings nor the sketch was ever disclosed or produced. *Id.*

At some point, some or all of the individual defendants drove Ms. Sandoval to Plaintiff's home for the purpose of evaluating whether Plaintiff's Winnebago was the same vehicle she observed the night of the fire. *Id.* ¶ 27. When she failed to positively identify the vehicle, some or all of the defendants relocated the Winnebago "and surrounded it with several marked police cars and law enforcement officers." *Id.* At this point, Ms. Sandoval identified the Winnebago as the vehicle in question. *Id.* Plaintiff alleges that some or all of the defendants subsequently falsified their police reports such that descriptions Ms. Sandoval had previously given about the vehicle more closely matched his Winnebago. *Id.* ¶ 28.

Plaintiff alleges that Evers and other defendants "reached an agreement to falsely claim that the cause of the fire was arson and that the culprit was Plaintiff." *Id.* ¶ 29. Plaintiff alleges that some or all of the defendants also fabricated documents that showed his financial situation was precarious and that he had a "vendetta" against his tenants. *Id.* ¶ 30. Plaintiff states that at the time of the fire, his finances were "healthy and secure," and although he had initiated eviction proceedings against the tenants, he had allowed them to stay in place "through the holidays," and that he was "actively negotiating" the sale of the property. *Id.*

Plaintiff's jury trial began on February 16, 1999. *Id.* ¶ 31. Plaintiff claims that the prosecution

4

1   relied on "false 'arson' conclusions" reached by Reuscher and Evers, Ms. Sandoval's "doctored"

2   eyewitness testimony, and "falsified evidence suggesting that Plaintiff was in dire financial straits." *Id.*

3   Plaintiff alleges that the individual defendants also "failed to inform the prosecutors that the arson

4   'science' they utilized was outdated and debunked." *Id.* ¶ 32. Plaintiff claims that absent these activities,

5   there would not have been probable cause for his prosecution. *Id.* In his defense, Plaintiff put forth

6   evidence that challenged the conclusion that the fire had been intentionally set and that Plaintiff had a

7   financial incentive to start the fire. *Id.* ¶ 32. Ultimately, the jury was not able to reach a unanimous

8   verdict and the judge declared a mistrial. About a year later, Plaintiff was re-tried. *Id.* ¶ 35. The

9   prosecution presented the same case as it did in the first trial. *Id.* ¶ 36. This time, Plaintiff was found

10   guilty and sentenced to life imprisonment.[4] As described above, Plaintiff successfully challenged his

11   conviction pursuant to 28 U.S.C. § 2254.

12   ### IV. **STANDARD OF DECISION**

13   A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is a challenge to the sufficiency of the

14   allegations set forth in the complaint. A 12(b)(6) dismissal is proper where there is either a "lack of a

15   cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory."

16   *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). In considering a motion to dismiss

17   for failure to state a claim, the court generally accepts as true the allegations in the complaint, construes

18   the pleading in the light most favorable to the party opposing the motion, and resolves all doubts in the

19   pleader's favor. *Lazy Y. Ranch LTD v. Behrens,* 546 F.3d 580, 588 (9th Cir. 2008).

20   To survive a 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim

21   to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim

22   has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

23   reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S.

24

25   ---

[4] Plaintiff did not identify the charges in his FAC. According to the Findings and Recommendations adopted with respect to his habeas petition, he was prosecuted for arson and three counts of murder with special circumstances.  F & R's at 2.

662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility for entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Thus, "bare assertions . . . amount[ing] to nothing more than a 'formulaic recitation of the elements' . . . are not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. In practice, "a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562. In other words, the Complaint must describe the alleged misconduct in enough detail to lay the foundation for an identified legal claim. To the extent that the pleadings can be cured by the allegation of additional facts, the plaintiff should be afforded leave to amend. *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

# V. ANALYSIS

## A.   Due Process Claims

Plaintiff alleges four due process violations:  (1) suppressing exculpatory evidence, (2) fabricating evidence, (3) using suggestive eyewitness identification methods, and (4) conducting a reckless investigation against all individual Defendants. FAC ¶ 59.

### 1.   Suppression/Destruction of Evidence Claims

#### a.   Legal Background

In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of

evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "[T]he materiality standard for *Brady* claims is met when 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Banks v. Dretke*, 540 U.S. 668, 698 (2004) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). *Brady* claims generally involve "the discovery, after trial, of information which had been known to the prosecution but unknown to the defense." *United States v. Agurs*, 427 U.S. 97, 103 (1976). Whether or not the suppression of evidence amounts to a due process violation "must be evaluated in the context of the entire record." *Id.* at 112-13.

While "the good or bad faith of the State" is "irrelevant" under *Brady*, the Supreme Court has found that "the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988). Thus, for the destruction or loss of evidence to amount to a constitutional violation, "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984)). Alternatively, "where lost or destroyed evidence is deemed to be only potentially exculpatory, as opposed to apparently exculpatory, the defendant must show that the evidence was destroyed in bad faith." *United States v. Estrada*, 453 F.3d 1208, 1212 (9th Cir. 2006) (citing *Youngblood*, 488 U.S. at 51). The bad faith requirement "both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases

1    in which the police themselves by their conduct indicate that the evidence could form a basis for

2    exonerating the defendant." *Youngblood*, 488 U.S. at 58.

3    **b.      Exculpatory or Impeachment Value of the Missing Evidence**

4        To establish either a *Brady* or *Youngblood* claim, a plaintiff must show that the suppressed or

5    withheld evidence was material to his case, either because it was exculpatory or because it was

6    impeaching. *Strickler*, 527 U.S. at 281; *Trombetta*, 467 U.S. at 489. Defendants argue that Plaintiff's

7    claims fail because he presents no basis for believing that the sketch or recording had exculpatory or

8    impeachment value.

9        The parties do not identify any cases that deal with the pleading standards necessary for a *Brady*

10   or *Youngblood* claim to survive a motion to dismiss. However, their briefs (and the Court's own

11   research) identify many cases in which the materiality of suppressed or lost evidence has been analyzed

12   at later stages of litigation. These cases provide guidance as to what Plaintiff must demonstrate to

13   succeed on his claim. For example, in *United States v. Drake*, police had access to, but ultimately lost,

14   surveillance video of a robbery. 543 F.3d 1080, 1083 (9th Cir. 2008). The Ninth Circuit found that the

15   materiality element was not met here because "[t]he digital recording of the robbery here was far from

16   clearly exculpatory; indeed, it is possible that it would have further incriminated [the defendant]." *Id.* at

17   1090. Similarly, in *Ford v. McDonald*, a criminal defendant asserted that the loss of a recording of an

18   interview with a witness amounted to a due process violation that was later summarized in a report. No.

19   ED CV 09-0275, 2010 WL 3929454, at *9 (C.D. Cal. July 23, 2010), *report and recommendation*

20   *adopted*, No. ED CV 09-0275, 2010 WL 3929453 (C.D. Cal. Oct. 2, 2010). The Court found that

21   Petitioner's belief that the recording "might have revealed that [the witness] said 'something  completely

22   different'" from his trial testimony rested on "unadulterated speculation" and that it was also possible

23   "that the recording might have contained additional evidence that would inculpate, and not exculpate,

24   Petitioner." *Id.* at 10. Critically, in these cases defendant-petitioners had no basis for claiming what was

25   contained in the evidence. In contrast, in *Tennison v. City & Cty. of San Francisco*, the Ninth Circuit

8

found a *Brady* violation may have occurred where police officers did not turn over to prosecutors statements a defense witness made to them indicating that they had arrested the wrong man and contradicting the account of another key witness. 570 F.3d 1078, 1091 (9th Cir. 2009).

Construing the facts in a light most positive to Plaintiff, the Court must credit his allegations that Defendants withheld, and perhaps destroyed, a recording in which Ms. Sandoval, the sole eyewitness, originally described the suspect and vehicle she saw the night of the incident "in a manner that did not match either Plaintiff or his vehicle." FAC ¶ 25. The Court must also credit his allegation that Defendants withheld and perhaps destroyed a sketch she made depicting a vehicle that did no match his own. *Id.* These allegations are different from those in *Drake* and *Ford* because in those cases, defendants could not show that the suppressed materials said anything in particular. Here, Plaintiff has alleged that the evidence does show something—that statements and drawings of the perpetrator did not match him. While the statements are not of such obvious value as the ones suppressed in *Tennison*, they are enough to it is difficult to see how these things would not, at least potentially, have value showing that Plaintiff was not the man whom Ms. Sandoval saw on the night of the fire. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible."). Thus, Plaintiff has alleged facts that plausibly suggest these materials potentially had exculpatory or impeachment value.

### c. <u>Prejudice/Comparable Evidence</u>

Materiality is a necessary, but not the sole, condition for establishing a claim under either *Brady* or *Youngblood.* Under *Brady*, a plaintiff must show that his case was prejudiced. *Strickler*, 527 U.S. at 281-82.[5] Under *Youngblood*, a plaintiff must show that the evidence is of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."

---

[5] While it is not clear that Plaintiff has alleged sufficient facts to meet the materiality standard in *Brady*, in an abundance of caution the Court analyzes whether the facts alleged meet the prejudice element.

1  *Trombetta*, 467 U.S. 479, 489.  Defendants argue that because Plaintiff did not establish that "the

2  underlying information was exclusively in the government's possession" or that "he did not have

3  reasonable access to the same information," he fails to state a claim under either standard. MTD at 17-

4  18.[6]

### (1)   Prejudice

6  In evaluating whether a Defendant is prejudiced by the suppression of evidence, courts review

7  the trial record to determine whether there is "a reasonable probability that the suppressed evidence

8  would have produced a different verdict." *United States v. Howell*, 231 F.3d 615, 627 (9th Cir. 2000). In

9  *Howell*, witnesses for the prosecution testified that they had found about $2000 in cash on a defendant's

10  person, though it was stated in a report (turned over to defendants) that this money was found on a

11  witness, not him. *Id.* at 623.  It was later revealed that the prosecutor was aware that the report was

12  erroneous, but contended that he/she had no duty to disclose the mistake to the defense because the

13  defendant "knew the truth and could have informed his counsel." *Id.* The Ninth Circuit found that this

14  conduct did not amount to a constitutional violation because the record showed that "the defense was

15  able to effectively cross-examine the witnesses about the inconsistency between their trial testimony and

16  the nondisclosed evidence, and that the prosecution introduced significant evidence independent of the

17  evidence withheld by the government, including the confession of the defendant." *Id.* at 627.  Under

18  such circumstances no prejudice resulted because "there was no reasonable probability that the

19  suppressed evidence would have produced a different verdict." *Id.* Similarly, in *United States v. Wilson*,

20  a habeas petitioner alleged that the government had withheld testimony given by an investigating

21  officer's girlfriend regarding the officer's "alleged intention to 'set up' [the petitioner] by framing him

22  for an arms exportation conviction." 901 F.2d 378, 381 (4th Cir. 1990). The Fourth Circuit found that

---

[6] The parties treat the evaluation of prejudice and comparable evidence as if they are one and the same. While the case law appears to have similar logical underpinnings, there is no precedent for treating the analyses as interchangeable. Therefore, the Court will analyze these elements separately.

10

1  while the girlfriend's statements "could have helped [petitioner's] case," there was no *Brady* violation

2  because he was free to question the girlfriend at trial. *Id.*

3      Defendants argue that Plaintiff's claim fails under *Brady* because he does not allege facts that

4  suggest that his trial was prejudiced. MTD at 19. Pointing to the trial transcripts, they observe that

5  Plaintiff can and did cross-examine Ms. Sandoval, as well as the officers who interviewed her, regarding

6  her recollections of the night of the fire. *Id.* Plaintiff acknowledges that he was able to cross-examine

7  Defendants at trial.[7] Opposition at 20. However, he argues that his claims are viable because his

8  pleadings cannot be read to show that these examinations were sufficient to protect his due process

9  rights. The Court agrees that the FAC is silent on this point, but not that this silence supports the

10  viability of his claim.

11      A *Brady* claim is fundamentally about the integrity of the trial, and whether the suppression of

12  favorable evidence has "undermine[d] confidence in the verdict." *Banks*, 540 U.S. at 698. Here, Plaintiff

13  fails to allege facts that show the suppressed evidence affected the trial. Plaintiff refers to Ms.

14  Sandoval's role in the trial summarily, stating that the prosecution's case depended in part on her

15  "doctored eyewitness testimony." FAC ¶ 31. Plaintiff does not explain, however, what made her trial

16  testimony "doctored." For example, he does not allege that her testimony at trial differed from the

17  statements she had previously given to police; nor does he allege that her own account of the night in

18  question changed over time. Because it is not clear why Ms. Sandoval's trial testimony is suspect, it is

19  also not clear how production of the recording or the sketch may have affected the outcome of the trial.

20  Thus Plaintiff's allegation that officers suppressed the recording and sketch is not sufficient to "nudge[]

21  his claim" that their suppression prejudiced his case  "across the line from conceivable to plausible."

22  *Iqbal*, 556 U.S. at 680. Thus, he fails to allege a plausible claim under *Brady*.

23  _____

24  [7] Plaintiff qualifies this acknowledgement by saying that his ability to cross-examine them is "a topic that has been and will continue to be a matter of serious debate." Opposition at 20. However, it is unclear what about the cross-examinations is

25  subject to debate.

1

**(2)     Comparable Evidence**

2
        As with the analysis of prejudice, when courts evaluate whether or not comparable evidence

3
exists they look to the entire trial record. In *Trombetta*, for instance, the Supreme Court considered

4
whether the destruction of breathalyzer samples violated a plaintiff's due process rights. 467 U.S. 479 at

5
489. The *Trombetta* Court found that even if the samples had exculpatory value because they were

6
inaccurately analyzed by police, it "d[id] not follow that respondents were without alternative means of

7
demonstrating their innocence." *Id.* at 490. This is because the few sources of error that could lead to a

8
faulty breathalyzer analysis could be introduced at trial through other means. *Id.* Accordingly, courts

9
have rejected *Youngblood* claims where the facts point to "any reasonably available evidence which

10
would be comparable." *United States v. Cooper*, 983 F.2d 928, 932 (9th Cir. 1993).

11
        For example, *Elmore v. Foltz* involved a situation where officers had audio recordings of the

12
petitioner allegedly selling heroin to an informant. 768 F.2d 773, 774 (6th Cir. 1985). The state never

13
produced the tapes and they were destroyed for budgetary reasons after trial. *Id.* The Sixth Circuit

14
ultimately held that this did not amount to a constitutional violation, in part because the petitioner was

15
able to raise doubts about the informant's reliability at trial. *Id.* at 778. While the Court recognized that

16
"no better tool exists for impeaching [the informant] than a tape directly contradicting him," it held that

17
"[u]nder *Trombetta*, though, all that matters is that some reasonable alternative means exists for

18
attempting to do what one would have attempted to do with the destroyed evidence." *Id.* In contrast, in

19
*Cooper*, the Ninth Circuit considered whether comparable evidence existed for laboratory equipment

20
that was seized and destroyed prior to defendants' trial for methamphetamine production. 983 F.2d at

21
932.  The defendants alleged that one of the destroyed pieces of equipment was a 125-gallon reaction

22
vessel that was custom reconfigured to facilitate manufacture of a particular (and legitimate)

23
pharmaceutical.  *Id.* Their expert testified that if the vessel was designed in that manner, then it could

24
not have been used for manufacturing methamphetamine. *Id.* The Ninth Circuit agreed with the

25
defendants that there was "no adequate substitute for the laboratory equipment" and the government's

1    failure to preserve it violated their due process rights.  *Id.*

2          As above, Defendants argue that Ms. Sandoval's availability at trial presented a reasonable

3    alternative to the recording and the sketch. MTD at 18-19. Plaintiff, again, argues that his sparse

4    allegations cannot be read in a manner that suggests that comparable evidence existed. Opposition at 19-

5    21. Accordingly, the Court comes to a similar conclusion with respect to his claim under *Youngblood* as

6    it did under *Brady*. Plaintiff has not alleged facts that suggest that either the recording or the sketch were

7    unique, as was the case with the lab equipment in *Cooper*. Rather, his facts suggest a situation in which

8    many individuals would be competent to discuss what was said in the interview and what was drawn in

9    the picture, just as witnesses were able to testify as to the material that was recorded in *Elmore* and the

10   samples that were destroyed in *Trombetta*.

11         For the above reasons, the Court concludes that Plaintiff has not alleged facts from which it can

12   conclude that Defendants suppressed or destroyed evidence in violation of his due process rights.

13   Accordingly, the Court GRANTS Defendants' motion to dismiss this claim.  Plaintiff will be allowed to

14   amend this claim.[8]

15         **2.      Fabrication of Evidence**

16                **a.      Legal Background**

17         In *Devereaux v. Abbey*, the Ninth Circuit recognized that the deliberate fabrication of evidence

18   may serve as a basis for a due process claim where: "(1) Defendants continued their investigation of [a

19   plaintiff] despite the fact that they knew or should have known that he was innocent; or (2) Defendants

20   used investigative techniques that were so coercive and abusive that they knew or should have known

21   that those techniques would yield false information." 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

22   _____

23   [8] Defendants argue that Plaintiff should not be granted leave to amend because he cannot plausibly allege the recording or
     sketch are exculpatory without violating Rule 11. MTD at 19; *see also* MTD at 3 ("[N]o amendments would pass Rule 11
24   scrutiny."). This Court takes allegations of misconduct <u>very</u> seriously and will not assume that attorneys will knowingly
     mislead the Court. Counsel is advised that threatening to move for sanctions without having a credible basis to do so is
25   questionable conduct in and of itself.

However, "[t]hese methods are not themselves independent causes of action." *Bradford v. Scherschligt*, 803 F.3d 382, 386 (9th Cir. 2015). "Rather, they are methods of proving one element—intent—of a claim that the government deliberately fabricated the evidence at issue." *Id.* "Fundamentally, the plaintiff must first point to evidence he contends the government deliberately fabricated." *Id.*

Fabrication of evidence claims usually arise out of situations in which evidence comes to light that contradicts facts asserted by officials in their testimony or reports.  Perhaps for this reason, they are usually decided at summary judgment. For example, in *Costanich v. Dep't of Soc. & Health Servs.*, witnesses came forward and testified that they had not made statements that had been attributed to them by a social worker in her report. 627 F.3d 1101, 1112 (9th Cir. 2010).[9]  The Ninth Circuit found a due process violation because "[t]he errors in [the social worker's] report are not questions of tone or characterization but actual misrepresentations." *Id.*  at 1113.  In contrast, in *Gausvik v. Perez*, it was revealed that a police officer investigating allegations of child abuse inaccurately stated in his probable cause affidavit that the children tested "positive" for child abuse when the tests were only "suggestive" or "consistent" with child abuse and incorrectly stated that eight children accused the plaintiff of child abuse when, in fact, only two had positively identified him. 345 F.3d 813, 817 (9th Cir. 2003). The Ninth Circuit held that although the officer "may have been careless or inaccurate," it did not show that

_____

[9] For example,

> Duron's report indicated that she had interviewed thirty-four people. She later admitted that she had made only brief contact with eighteen of the individuals listed. The misrepresentations about interviewing the children's doctors were especially significant. The suggestion that she interviewed three of the therapists and received reports from a fourth lent credibility to her report, but, as Duron testified at the ALJ hearing, she did not actually speak to '[m]edical professionals'. . .
>
> Other witnesses pointed out that the report contained evidence or statements they never made. For example, according to Duron's report of her interview with Diane Isley, the guardian ad litem for F., Isley stated that Costanich, in reference to a child that might try to run away, said she would 'chain the little s[----] to the bed.' Isley declared in a sworn letter, however, that she never made this statement and that she never talked to Duron about such a child. Duron also reported that another aide, Crystal Hill, said that Costanich was 'always calling E. a f[ ---] c[ ---], and b[-----].'  In a sworn letter, however, Hill stated: 'I have never seen her directly swear face to face at one of the children.'

*Id.*

1    the officer continued the investigation despite knowing that plaintiff was innocent. *Id.* Therefore, the

2    officer was entitled to summary judgment . *Id.*

3        At the motion to dismiss phase, district courts have looked to whether a plaintiff alleges the

4    existence of evidence that would corroborate their claim. For example, in *Sommer v. United States*, a

5    plaintiff alleged that investigators "ignored the initial autopsy findings, the inconsistencies in the lab test

6    results, [and] the opinion of several independent forensic toxicologists," all of which pointed to the fact

7    that a victim was not poisoned with arsenic. 713 F. Supp. 2d 1191, 1199 (S.D. Cal. 2010). The Court

8    found that Plaintiff stated a viable *Devereaux* claim because the plaintiff "made specific, non-conclusory

9    allegations that, if proven, would be sufficient to establish that [investigators] continued to investigate

10   [her] despite knowing or having sufficient evidence that they should have known that [the victim] was

11   not murdered." *Id.* at 1201. In contrast, in *Masody v. Klopot*, the trial court found that a plaintiff failed to

12   allege a viable *Devereaux* claim where he alleged that his spouse, who accused him of domestic

13   violence, "fooled [investigators] with her convincing allegations against Plaintiff." No. 14-CV-04562-

14   MEJ, 2015 WL 1264852, at *3 (N.D. Cal. Mar. 19, 2015). Ultimately, the fact that investigators

15   believed his spouse's allegations over his version of events was not sufficient to support a deliberate

16   fabrication of evidence claim. *Id.* at *4.

17        **b.    Whether Plaintiff Sufficiently Alleges that Defendants Fabricated Evidence**

18        Plaintiff claims that individual defendants fabricated evidence by: 1) making false

19   representations that Plaintiff's financial situation was "precarious" and that Plaintiff "had a vendetta

20   against his tenants" (FAC ¶ 30) and 2) falsifying police reports to make Ms. Sandoval's descriptions of

21   the vehicle she saw more consistent with Plaintiff's Winnebago (FAC ¶ 28). Defendants argue that

22   Plaintiff's claim "goes to conclusions in the unspecified reports, not to any false facts contained in them,

23   which is insufficient to support a claim." Opposition at 15.

24        The Court agrees that Plaintiff's claim about how Defendants may have characterized his

25   financial situation and his relationship with his tenants is insufficient because it fails to identify *which*

*statements* were misrepresented and *what evidence* was falsified with respect to these allegations. Thus, the claim fails at the threshold level because it does not identify the evidence in question. *Bradford*, 803 F.3d at 386. This also means that it is not clear what basis he had for concluding that such evidence was falsified or fabricated.

Further, unlike the plaintiff in *Sommer*, Plaintiff does not allege the existence of evidence that plausibly suggests that Defendants knew or should have known that he was innocent or that they used investigative techniques that they knew or should have known would yield false information. 263 F.3d at1076. First, Plaintiff fails to allege facts that suggest that the individual Defendants knew or should have known Plaintiff was innocent. While Plaintiff claims that Reuscher's conclusion that the fire was arson was "totally wrong," (FAC ¶ 21), he also claims that MFD officers were not adequately trained to investigate arson (FAC ¶¶ 54-55). Thus, to the extent that Defendants *may* have been wrong about the fire being cause by arson, the facts alleged suggest this conclusion would have been the result of inadequate training at most, not an intent to deceive. Defendants would not have violated Plaintiff's due process rights even if their conclusions resulted from a "careless or inaccurate" investigation. *See Gausvik*, 345 F.3d at 817.

Plaintiff alleges that at the time of the fire his finances were "healthy and secure," that he had "willingly agreed to allow [his tenants] to continue living in the apartment," and the property that burned down "was valuable, as evidenced by the fact that Plaintiff was actively negotiating its sale." However, even if Plaintiff believed his finances to be "healthy and secure" and his relationship with his tenants to be positive, it is not unconstitutional for Defendants to come to alternative conclusions in their reports, absent evidence of intent to falsify evidence.  Under *Devereaux*, intent can be established with proof that Defendants continued their investigation of plaintiff despite the fact that they knew or should have known that he was innocent; or (2) used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information. 263 F.3d at 1076. Plaintiff does not allege that such evidence exists here. While Plaintiff may have been "negotiating" the

16

1   sale of his house, that in and of itself does not mean that his finances were not otherwise sound- or even

2   that the sale was likely. Similarly, the fact Plaintiff "willingly agreed" to allow his tenants to stay at his

3   property "through the holidays" does not plausibly suggest that it was a deliberate falsification to infer

4   that he had a poor relationship with them, especially since Plaintiff admits that he had initiated eviction

5   proceedings against them. FAC ¶ 30.[10]  As the *Masody* court concluded, it does not violate due process

6   for investigators to disbelieve Plaintiff's version of the events. 2015 WL 1264852, at *4.

7   　　　　Similarly, Plaintiff's claim that Defendants altered Ms. Sandoval's testimony also fails at the

8   threshold level because it does not identify the evidence or testimony in question. While Plaintiff claims

9   that Defendants "falsified their reports," he does not identify any particular report, nor does he show that

10   such a report was relied upon by prosecutors or otherwise affected the fairness of his trial. Further, the

11   claim is factually insufficient. Plaintiff is entitled to a presumption of truth that there was some

12   difference between Ms. Sandoval's description of Plaintiff's vehicle and how that description was

13   characterized in a report, and that the characterization in the report more closely resembled his vehicle.

14   However, Plaintiff is not entitled to a presumption that the difference resulted from a deliberate

15   fabrication. While a court might infer intent at the pleading stage, here the absence of factual details

16   makes such an inference unreasonable. *Iqbal*, 556 U.S. at 664 ("While legal conclusions can provide the

17   complaint's framework, they must be supported by factual allegations.").  Most tellingly, the FAC is

18   silent on the magnitude and extent of the alleged changes. In contrast, the *Costanich* plaintiff pointed to

19   evidence that *directly contradicted* the social worker's report.  627 F.3d at 1112; 713 F. Supp. 2d at

20   1199. Here, Plaintiff only presents a vague allegation that a description in a police report did not exactly

21   match Ms. Sandoval's original description. Without *some* facts indicating that the changes were

22   significant or that the Defendants were acting with unlawful intent, the Court cannot reasonably infer

23   _____

24   [10] Arguably, Plaintiff's allegations regarding Ms. Sandoval's identification of his vehicle (FAC ¶ 27) could be interpreted as
     alleging factual support under the second prong of *Devereaux*. Plaintiff, however, does not make this argument. Moreover,
25   the Court is not aware of any case law that supports a conclusion that the allegations concerning the Defendants' treatment of
     Ms. Sandoval was coercive. *See* section (V)(A)(3), below.

1    that they deliberately falsified evidence under the second prong of *Devereaux*.

2           For these reasons, the Court GRANTS Defendants' motion to dismiss Plaintiff's due process

3    claim based on his theory that Defendants fabricated evidence. Plaintiff is granted leave to amend this

4    claim.

5           **3.    Suggestive Eye Witness Identification**

6            In the heading of Plaintiff's due process claim, he seeks to hold Defendants liable for

7    "suggestive eyewitness identification," but does not make clear which facts are tied to this claim. FAC at

8    14: 6-7. Defendants interpret this claim to refer to Ms. Sandoval's identification of Plaintiff's vehicle.

9    MTD at 11-12. Plaintiff confirmed that this conduct is the basis of this claim. Opposition at 17-18.

10          The parties dispute whether the procedure Defendants used was so suggestive that it necessarily

11   caused "a very substantial likelihood of irreparable misidentification." *Manson v. Brathwaite*, 432 U.S.

12   98, 116, (1977). This standard, however, was established to determine "the admissibility of

13   identification testimony for . . . confrontations" *of a criminal defendant*. *Id.* at 114. Indeed, every case

14   cited by the parties involved identification of a criminal defendant, as opposed to *his personal effects*.

15   *See, e.g. Mason v. United States*, 414 F.2d 1176, 1182 (D.C. Cir. 1969) ("[S]howing of a single

16   photograph is, like all identification procedures involving a single suspect, highly suggestive."). Thus, it

17   is unclear that identification procedures used to identify objects can support a due process claim under

18   section 1983.

19          Defendants argue, however, that, to the extent that Plaintiff's claim may be actionable, they

20   would be entitled to qualified immunity. MTD at 23. The Court agrees. Plaintiffs did not identify (nor

21   could the Court find) *any* cases that suggest that it is clearly established that in-field identification of a

22   vehicle can amount to unconstitutionally suggestive eyewitness identification.

23          The Court therefore GRANTS Defendants' motion to dismiss Plaintiff's due process claim to the

24   extent that it is based on "suggestive eyewitness identification." Because amendment would be futile,

25   Plaintiff is not granted leave to amend this claim.

### 4. **Reckless Investigation**

Plaintiff also alleges in a heading that Defendants may be liable under section 1983 for conducting a reckless investigation. FAC at 14:7-8. Again, Plaintiff does not tie any facts to this claim. Defendants argue that the Court should disregard this allegation because a "reckless investigation" is not a cognizable claim under section 1983. MTD at 9, n.7.  Plaintiff does not respond to this argument in his Opposition. Nor could this Court find any cases where the Ninth Circuit recognized "reckless investigation" as an independent cause of action. In *Tennison*, 570 F.3d at 1089, a panel referred to the fact that the Eighth Circuit recognized "a substantive due process cause of action for reckless investigation." The *Tennison* Court, however, used this case by analogy to determine the level of culpability necessary to succeed on a *Brady* claim. *Id.* On this basis, it found that a section 1983 plaintiff may be able to succeed on a claim that "police officers acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors" because such a claim is "consistent with the standard imposed in the substantive due process context, in which government action may violate due process if it 'shocks the conscience.'" *Id.* Moreover, in *Devereaux*, the Ninth Circuit recognized that there is "no constitutional due process right" to have an "investigation carried out in a particular way." 263 F.3d at 1075.[11] In light of the above, the Court agrees that a "reckless investigation," in and of itself, does not present a cause of action under § 1983. Thus, the Court GRANTS Defendants' motion to dismiss Plaintiffs due process claim, to the extent that it is based on a theory or "reckless investigation." Because amendment would be futile, Plaintiff is not granted leave to amend this claim.

### B. **Malicious Prosecution Claims**

Defendants argue that Plaintiff's malicious prosecution claim must fail because Plaintiff's criminal case was not terminated in his favor. MTD at 19. Plaintiff counters that while he plead *nolo*

---

[11] While the *Devereaux* Court found that investigatory conduct that is "coercive" or "abusive" may violate due process rights, the Ninth Circuit has never suggested that officers may be liable for conduct that falls below that standard.  263 F.3d at 1076.

*contendre* to involuntary manslaughter, the charges of arson and murder were dismissed. Opposition at 22; *see also* FAC ¶ 43. He argues that his malicious prosecution claim is viable as to the dismissed claims because the factual grounds for the charges are distinct. *Id.*

A malicious prosecution claims is viable under section 1983 when "the prosecution is conducted with the intent to deprive a person of equal protection of the laws or is otherwise intended to subject a person to a denial of constitutional rights." *Bretz v. Kelman*, 773 F.2d 1026, 1031 (9th Cir.1985) (en banc). Thus, a malicious prosecution plaintiff "must show that the defendants prosecuted her with malice and without probable cause, and that they did so for the purpose of denying her equal protection or another specific constitutional right." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir.1995). A malicious prosecution claim under § 1983 is based on state law elements. *Usher v. City of Los Angeles*, 828 F.2d 556, 562 (9th Cir. 1987). In order to establish a cause of action for malicious prosecution a plaintiff must plead and prove that "the prior proceeding, commenced by or at the direction of the malicious prosecution defendant, was (1) pursued to a legal termination favorable to the plaintiff; (2) brought without probable cause; and (3) initiated with malice." *Villa v. Cole*, 4 Cal. App. 4th 1327, 1335 (1992).

Plaintiff cites to *Heck*, 512 U.S. 477, 487 (1994), and its progeny, for the theory that he has a viable claim if his plea doesn't "necessarily imply the invalidity" of the criminal prosecution to which he entered a plea. Opposition at 23. These cases, however, are distinct because they are based on constitutional, not state law, violations. *Jackson v. Barnes*, 749 F.3d 755, 762 (9th Cir. 2014) (plaintiff's Fifth Amendment claims not *Heck*-barred); *Beets v. Cty. of Los Angeles*, 669 F.3d 1038, 1040 (9th Cir. 2012) (excessive force claims *Heck*-barred); *Lockett v. Ericson*, 656 F.3d 892, 898 (9th Cir. 2011) (Fourth Amendment claims not barred by *Heck*); *Ramirez v. Galaza*, 334 F.3d 850, 853 (9th Cir. 2003) (considering whether plaintiff's "federal constitutional rights of Due Process and Equal Protection" were violated); *Ove v. Gwinn*, 264 F.3d 817, 825 (9th Cir. 2001) (Fourth Amendment claims not barred by *Heck*).

1    As Defendants point out, Plaintiff's malicious prosecution claim is grounded in state law.

2    *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) ("We look to California law to

3    determine the legal effect of the state court's action because we have incorporated the relevant elements

4    of the common law tort of malicious prosecution into our analysis under § 1983.").  Under California

5    law, "[a]n individual seeking to bring a malicious prosecution claim must generally establish that the

6    prior proceedings terminated in such a manner as to indicate his innocence." *Id.* at 1068.  California

7    courts have found that, "as a matter of law, [] the favorable termination which is essential to the plaintiff

8    in a malicious prosecution action can not be based on the dismissal of the criminal charges remaining

9    after the defendant in a criminal proceeding has entered a plea of *nolo contendere* to one or more of the

10   charges in the accusatory pleading pursuant to a plea bargain." *Cote v. Henderson*, 218 Cal. App. 3d

11   796, 804 (1990). In other words, "[t]he entire action must terminate in a plaintiff's favor in order for a

12   plaintiff to maintain a claim for malicious prosecution." *Nhia Kao Vang v. Decker*, 607 F. App'x 728,

13   729 (9th Cir. 2015) (citing *Crowley v. Katleman*, 8 Cal. 4th 666 (1994)).

14    Here, Plaintiff admits that he pled *nolo contendre*, and that the murder and arson charges

15   brought against him were dismissed as part of a plea bargain. FAC ¶ 43. Because the "entire action" was

16   not resolved in his favor, his allegations do not support the conclusion that the "prior proceedings

17   terminated in such a manner as to indicate his innocence." *Nhia Kao Vang*, 607 F. App'x at 729.  He is

18   therefore precluded from bringing a claim of malicious prosecution. *Id.* Accordingly, the Court

19   GRANTS Defendants' motion to dismiss Plaintiff's malicious prosecution claims, FAC ¶¶ 63-72, with

20   prejudice.

21   **C.    Supervisory Liability**

22    Plaintiff alleges that Defendants Harden and Reuscher are liable because they "personally knew

23   about, facilitated, approved, and/or condoned this pattern and practice of misconduct, or least [sic]

24   recklessly caused the alleged deprivation by their actions or by their deliberately indifferent failure to

25   act." FAC ¶ 82. Defendants argue that this claim should be dismissed Plaintiff did not allege any facts

21

1  supporting these allegations. MTD at 22-23. In his Opposition, Plaintiff points to several places in his

2  pleadings where he attributed certain acts to Reuscher and explained that Reuscher and Harden were

3  necessarily included in allegations attributed to "all Defendants." He claims that his identification of

4  them as "supervisors" in the context of these actions is sufficient to invoke supervisory liability.

5  Opposition at 26-27.

6         Under § 1983 case law, supervisory liability may be imposed against an official who "set in

7  motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he

8  knew or reasonably should have known, would cause others to inflict the constitutional injury." *Larez v.*

9  *City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991). Thus, a supervisor may be liable for his "own

10  culpable action or inaction in the training, supervision, or control of his subordinates; for his

11  acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that

12  showed a reckless or callous indifference to the rights of others." *Id.*

13         As Defendants point out, Plaintiff fails to identify any specific conduct or activity that would link

14  the events of which they are accused to their supervisory roles.  For example, Plaintiff alleges that

15  Harden "assigned Lee to be a case officer" and "was responsible for delegating the investigative

16  responsibilities to Modesto Police Department officers, including the MPD Defendant Officers." FAC ¶

17  24. He also claims that Reuscher was "the lead Fire Inspector" and "falsely claimed it was an arson

18  fire." *Id.* ¶ 21.  Plaintiff however, does not allege that either Harden or Reuscher "set in motion" or

19  "knowingly refused to terminate" any events that lead to a constitutional injury. Thus he has not shown

20  that either Reuscher or Harden may be culpable in their capacity as supervisors. Accordingly, the Court

21  GRANTS Defendants' motion to dismiss Plaintiff's supervisor liability claims against Reuscher and

22  Harden, FAC ¶¶ 81-86.  Plaintiff is granted leave to amend these claims.

23  **D.**    **Conspiracy Claims**

24         Plaintiff alleges that "the Individual Defendants reached an agreement amongst themselves to

25  frame Plaintiff for the crime and, and to thereby deprive Plaintiff of his constitutional rights, all as

1  described in the various Paragraphs of the Complaint." FAC ¶¶ 29, 74. In a footnote, Defendants argue

2  that this claim is insufficient. MTD at 23 n. 13. Plaintiff argues that he alleges that "Reuscher and Evers

3  "fraudulently criminalized the nature of the fire" and that the MPD Defendants "knowingly coerced"

4  Sandoval to implicate Plaintiff and "falsified and fabricated police reports . . ." Opposition at 26-27. The

5  Court agrees that Plaintiff has failed to allege facts that make it plausible that Defendants conspired to

6  frame him. Plaintiff rests most of the factual basis for these allegations on his assertion that Reuscher

7  was "totally wrong" about the fact that fire was caused by arson and that his conclusion was "at odds

8  with the scientific community." FAC ¶¶ 21-23. Being wrong, however, is not a constitutional violation.

9  *Gausvik*, 345 F.3d at 817. Similarly, the allegations that Lee, Ridenour, Pimentel and Reuscher

10 "knowingly coerced" Sandoval are based on the slim facts surrounding her identification of Plaintiff's

11 vehicle. As discussed above, these allegations are insufficient to implicate Defendants under section

12 1983. In sum, facts alleged by Plaintiff are insufficient for this Court to "draw the reasonable inference"

13 that and of the Defendants are liable for conspiring to violate his rights. *Iqbal*, 556 U.S. at 678. Thus, the

14 Court GRANTS Defendants' motion to dismiss this claim. Plaintiff is granted leave to amend this claim.

15 **E.    *Monell* Claims**

16        Municipalities and local governments can be liable for damages under section 1983 when "action

17 pursuant to official municipal policy of some nature cause[s] a constitutional tort." *Monell v. Dep't of*

18 *Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). Local governments are not liable, however,

19 for simply employing a tortfeasor. *Id.* at 694–95 ("Instead, it is when execution of a government's policy

20 or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

21 represent official policy, inflicts the injury that the government as an entity is responsible under §

22 1983."). A government entity may be liable under section 1983 claim if a policy, practice, or custom of

23 the entity can be shown to be "a moving force behind a violation of constitutional rights." *Dougherty v.*

24 *City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

25        The Ninth Circuit has recognized four distinct ways to demonstrate a municipal policy or

custom:

> (1) "[W]hen execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . ."

> (2) where "the constitutional tort was the result of a longstanding practice or custom which constitutes the standard operating procedure' of the local government entity . . . "

> (3) by showing that "the tortfeasor was an official whose acts fairly represent official policy such that the challenged act constituted an official policy . . ." or

> (4) by showing that "an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate."

*Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008) (internal quotation marks and citations omitted).[12]

Plaintiff claims that the

> MPD had no established or clear policy regarding the following issues pertaining to eyewitness identification and exculpatory (*Brady*) information: (a) ensuring that eyewitness identification procedures complied with the requirements of due process, including those set out in *Manson v. Braithwaite*, 432 U.S. 98 (1977) and *Neil v. Biggers*, 409 U.S. 188 (1972); (b) ensuring that MPD detectives and officers, whether through inadvertence or design, did not provide information to potential eyewitnesses that influenced the identification; (c) fully and completely documenting MPD detectives' and officers' interactions with eyewitnesses; (d) adequately training MPD detectives and officers not to influence eyewitness identifications and to provide exculpatory eyewitness identification information to the prosecutor(s) in the event the eyewitness made an identification; and (e) adequately supervising MPD detectives and officers to ensure that eyewitness identifications were not influenced by officers conducting them, and to ensure that exculpatory eyewitness identification information was provided to the prosecutor(s).

FAC ¶ 48. Plaintiff also alleges that the MFD is liable for failing to train its officers, including

Defendants Reuscher and Evers, in current standards for fire investigation. *Id.* ¶¶ 54-55. Defendants

argue that these allegations fail because they do not demonstrate that the City of Modesto has a pattern

or practice of unconstitutional behavior. In Plaintiff's response, he states that he "dedicates nearly four

---

[12] Courts may combine the first two prongs for efficiency. *See, e.g. Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005). This Court follows the example laid out in *Price* for simplicity.

1  pages of his complaint to describing the City of Modesto's policies and practices" and draws the legal

2  conclusion that Defendants' argument "does not hold water." Opposition at 30-31.

3        Under the first prong, liability arises through the adoption of a formal policy, defined as "a

4  deliberate choice to follow a course of action ... made from among various alternatives by the official or

5  officials responsible for establishing final policy with respect to the subject matter in question." *Oviatt*

6  *By & Through Waugh v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992) (citing *Pembaur v. City of*

7  *Cincinnati*, 475 U.S. 469, 483–484 (1986)). "Failure to train may amount to a policy of 'deliberate

8  indifference,' if the need to train was obvious and the failure to do so made a violation of constitutional

9  rights likely." *Dougherty*, 654 F.3d at 900 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

10  "Mere negligence in training or supervision, however, does not give rise to a *Monell* claim." *Id.* "Only

11  where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as

12  defined by our prior cases—can a city be liable for such a failure under § 1983." *City of Canton, Ohio*,

13  489 U.S. 378, 389 (1989). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof

14  that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cty. Comm'rs*

15  *of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410 (1997).  "A pattern of similar constitutional violations

16  by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of

17  failure to train." *Connick v. Thomps*on, 563 U.S. 51, 62 (2011)[13]  This determination is necessary

18  because Section 1983 does not encompass vicarious liability. *Clouthier v. Cnty. of Contra Costa*, 591

19  F.3d 1232, 1253 (9th Cir. 2010) ("[T]o hold cities liable under section 1983 whenever policymakers fail

20  to overrule the unconstitutional discretionary acts of subordinates would simply smuggle *respondeat*

21  *superior* liability into section 1983 law creating an end run around *Monell*."). Here, Plaintiff alleges that

22  _____

23  [13] The Supreme Court provided examples of where deliberate indifference might be inferred in *City of Canton, Ohio*: "For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The

24  city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights. It could also be that the police, in exercising their discretion,

25  so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need." 489 U.S. 378, 390 n. 10 (1989).

1   Modesto failed to train its firefighters to standards established by the National Fire Protection

2   Association, *id.* at ¶ 54, but does not suggest either that the failure to adopt them was the result of a

3   conscious choice or that any policy maker was even aware of the 1992 guidelines. Nor does the FAC

4   describe facts that would suggest that the need for such training was obvious or that the conduct at issue

5   was part of a pattern of unconstitutional behavior. Thus, under the first prong of *Price*, Plaintiff fails to

6   allege a viable claim.

7          Under the second prong, a plaintiff can maintain a claim by alleging that a "longstanding practice

8   or custom" has evolved, but this requires a showing of more than "isolated or sporadic incidents."

9   *Hunter v. Cty. of Sacramento*, 652 F.3d 1225, 1233 (9th Cir. 2011). Rather, "the custom must be so

10  'persistent and widespread' that it constitutes a 'permanent and well settled [municipal] policy.'" *Id.*

11  Although there is no bright line between "isolated or sporadic incidents" and "persistent and widespread

12  conduct" is not clearly delineated, one or two incidents are an insufficient showing to support a *Monell*

13  claim. *Compare Davis v. City of Ellensburg,* 869 F.2d 1230, 1233–34 (9th Cir. 1989) (single incident of

14  excessive force inadequate to establish liability); *Meehan v. County of Los Angeles,* 856 F.2d 102, 107

15  (9th Cir.1988) (two incidents insufficient) *with Menotti v. City of Seattle,* 409 F.3d 1113, 1147-48 (9th

16  Cir. 2005) (triable issue of fact existed as to whether Seattle had an unconstitutional policy or custom of

17  suppressing certain political speech based on six incidents). Here, Plaintiff  alleges that he was subjected

18  to each type of conduct one or two times (suppression and/or destruction of materials from one

19  interview, falsification of one police report, use of suggestive identification procedures on one

20  occasion).  FAC ¶¶ 25-30, 32. However, one or two occasions of misconduct is not enough to show

21  conduct that is "so persistent and widespread' that it constitutes a 'permanent and well settled

22  [municipal] policy." *Hunter*, 652 F.3d at 1233.

23         Under the third prong, liability hinges on the Supreme Court's holding "that municipal liability

24  may be imposed for a single decision by municipal policymakers under appropriate circumstances."

25

1    *Pembaur*, 475 U.S. at 480 ("[T]he power to establish policy is no more the exclusive province of the

2    legislature at the local level than at the state or national level."). This liability only attaches "where the

3    decisionmaker possesses final authority to establish municipal policy with respect to the action ordered "

4    and a "deliberate choice to follow a course of action is made from among various alternatives by the

5    official or officials responsible for establishing final policy with respect to the subject matter in

6    question." *Id.* at 481, 483 ("[W]here action is directed by those who establish governmental policy, the

7    municipality is equally responsible whether that action is to be taken only once or to be taken

8    repeatedly."). Here, Plaintiff does not allege facts that suggest that any one individual established a

9    policy that lead to his alleged constitutional injuries. Thus, he does not have a viable claim under this

10   theory.

11        The fourth prong reflects the fact that policymakers may delegate their authority to another

12   official. Liability may arise "if a particular decision by a subordinate was cast in the form of a policy

13   statement and expressly approved by the supervising policymaker ... [or] if a series of decisions by a

14   subordinate official manifested a 'custom or usage' of which the supervisor must have been aware."

15   *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992) (quoting *City of St. Louis v. Praprotnik*, 485

16   U.S. 112, 126 (1988)). However, a policymaker must "approve a subordinate's decision *and the basis for*

17   *it* before the policymaker will be deemed to have ratified the subordinate's discretionary decision." *Id.*

18   (emphasis in original). Here, Plaintiff does not allege that a City policy-maker has delegated authority to

19   a subordinate that was related to his constitutional injuries. Therefore, he fails to allege a viable theory

20   under the fourth prong. Because Plaintiff has not alleged facts that plausibly suggest that the City is

21   liable for his constitutional injuries, the Court will GRANT Defendants' motion to dismiss this claim.

22   Plaintiff will be given the opportunity to amend this claim.

23                          **VI. <u>CONCLUSION AND ORDER</u>**

24        The Court GRANTS Defendants' motion to dismiss, Doc. 47, as follows:

25        The Court GRANTS Defendants' motion to dismiss Plaintiff's claim that Defendants violated his

due process rights based on Plaintiff's theories that Defendants suppressed, destroyed and fabricated evidence as well as his reckless investigation and witness identification theories. Plaintiff is granted leave to amend his *Brady/Youngblood* and his fabrication of evidence claims, but not his reckless investigation or witness identification theories.

The Court GRANTS Defendants motion to dismiss Plaintiff's claim that Defendants are liable under section 1983 based on Plaintiff's malicious prosecution claims, FAC ¶¶ 64-72. Plaintiff is not granted leave to amend this claim, because amendment would be futile.

The Court GRANTS Defendants' motion to dismiss Plaintiff's supervisor liability claims against Reuscher and Harden, FAC ¶¶ 81-86, and his *Monell* claims against the City of Modesto, FAC ¶¶ 87-90. Plaintiff is granted leave to amend these claims.

Plaintiff shall file any amended complaint within 14 days of this order.

No later than 21 days after service of any amended complaint, Defendants shall file a response thereto.

Plaintiff is cautioned that this will be the last opportunity to amend. Plaintiff should only amend if amendment will not be futile based on the law and holding in this Order. This court does not have the resources to review and write extensive orders on how to write, rewrite and submit pleadings. This order gives the proper direction for the last time.

IT IS SO ORDERED.

Dated:   **June 29, 2016**              **/s/ Lawrence J. O'Neill**
                                        UNITED STATES CHIEF DISTRICT JUDGE